U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG 2 5 2017

CLERK, U.S. DISTRICT COURT
By_____
Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ROBBY JOE TREVINO and LAURIE §
DALE REED, Individually, and as §
Personal Representatives of the §
Estate of ALISHA TREVINO, and §
as next friend of A.N., a minor, §
§
Plaintiffs, §
§
VS. § NO. 4:17-CV-227-A
§
CITY OF FORT WORTH, ET AL., §
§
Defendants. §

## MEMORANDUM OPINION AND ORDER

Came on for consideration the motion of defendant Officer D.
Koplin ("Koplin"), the motion of defendants Officer Thomas Hauck
("Hauck"), Officer Matthew McMeans ("McMeans"), Officer C.
McAnulty ("McAnulty"), Officer J. Garcia ("Garcia"), and Officer
Sean R. LaCroix ("LaCroix"), and the second motion of defendant
Officer Jacob Hinz ("Hinz"), to dismiss. The court, having
considered the motions, the response[1] of plaintiffs, Robby Joe
Trevino and Laurie Dale Reed, Individually, and as personal
representatives of the Estate of Alisha Trevino, and as next
friend of A.N., a minor, the replies, the record, and applicable
authorities, finds that the motions should be granted.

---

[1]The court considers the response to include the document titled "Plaintiffs' Response to
Defendant Fort Worth Police Officers Assertion of Immunity" filed June 30, 2017.

## Plaintiffs' Claims

The operative pleading is plaintiffs' first amended complaint filed June 30, 2017. Doc.[2] 32. Plaintiffs allege:

On or around April 15, 2015, Fort Worth Police Department narcotics officers received information from a confidential informant that Alisha Trevino ("Trevino") and her boyfriend, Alfredo Cortez ("Cortez"), were transporting methamphetamine in their vehicle. Officers stopped the vehicle for an inoperable brake light. Before officers walked to the vehicle, Cortez saw Trevino shove a baggie containing methamphetamine into her pants. Officers arrested Cortez, who had outstanding warrants. Trevino was seated on the curb and spoke to officers. Trevino told officers she was cold and they put her in the back of a patrol car while a canine searched the vehicle in which Trevino and Cortez had been traveling. Trevino was unmonitored for a period of time. A search of the vehicle revealed 250.6 grams of methamphetamine in a woman's purse. Officers questioned Trevino about the methamphetamine. Trevino vomited on herself and was observed to be shaking and making herself cough. Officers generally believed Trevino was faking seizures to avoid going to jail. At the point it became clear that Trevino was really sick,

---

[2]The "Doc. __" reference is to the number of the item on the docket in this action.

officers called for an ambulance. Trevino was limp when the ambulance arrived and was unresponsive when placed on a stretcher. Trevino went into cardiac arrest on the way to the hospital. She was not revived until after advanced cardiac life support intervention at the hospital. Brain scans showed damage from lack of oxygen. Trevino was removed from life support and died on April 17, 2017. The medical examiner found two plastic baggies of methamphetamine in Trevino's stomach and stomach contents tested positive for methamphetamine.

Plaintiffs define the term "Fort Worth Police Officers" to mean defendants Hinz, Hauck, McAnulty, Koplin, and LaCroix.[3] Doc. 32 at 4, ¶ 15. They assert claims against these defendants for violation of 42 U.S.C. § 1983 for deliberate indifference to serious medical condition (count I), negligence (count V), gross negligence (count VI), violation of due process (count VII), and conspiracy (count IX).

## II.

## Grounds of the Motions

Movants each allege that plaintiffs have failed to state plausible claims against them. And, in any event, each of them is entitled to qualified immunity.

---

[3]These are the same defendants identified in plaintiffs' response to the assertion of immunity filed June 30, 2017. Doc. 33.

## Applicable Legal Standards

A.  Pleading

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, in a general way, the applicable standard of pleading. It requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks and ellipsis omitted). Although a complaint need not contain detailed factual allegations, the "showing" contemplated by Rule 8 requires the plaintiff to do more than simply allege legal conclusions or recite the elements of a cause of action. Twombly, 550 U.S. at 555 & n.3. Thus, while a court must accept all of the factual allegations in the complaint as true, it need not credit bare legal conclusions that are unsupported by any factual underpinnings. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Moreover, to survive a motion to dismiss for failure to state a claim, the facts pleaded must allow the court to infer

4

that the plaintiff's right to relief is plausible. Iqbal, 556
U.S. at 678. To allege a plausible right to relief, the facts
pleaded must suggest liability; allegations that are merely
consistent with unlawful conduct are insufficient. Id. In other
words, where the facts pleaded do no more than permit the court
to infer the possibility of misconduct, the complaint has not
shown that the pleader is entitled to relief. Id. at 679.
"Determining whether a complaint states a plausible claim for
relief . . . [is] a context-specific task that requires the
reviewing court to draw on its judicial experience and common
sense." Id.

As the Fifth Circuit has explained: "Where the complaint is
devoid of facts that would put the defendant on notice as to what
conduct supports the claims, the complaint fails to satisfy the
requirement of notice pleading." Anderson v. U.S. Dep't of
Housing & Urban Dev., 554 F.3d 525, 528 (5ᵗʰ Cir. 2008). In sum,
"a complaint must do more than name laws that may have been
violated by the defendant; it must also allege facts regarding
what conduct violated those laws. In other words, a complaint
must put the defendant on notice as to what conduct is being
called for defense in a court of law." Id. at 528-29.

In considering a motion to dismiss for failure to state a
claim, the court may consider documents attached to the motion if

5

they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. Scanlan v. Tex. A&M Univ., 343 F.3d 533, 536 (5th Cir. 2003). The court may also refer to matters of public record. Davis v. Bayless, 70 F.3d 367, 372 n.3 (5th Cir. 1995); Cinel v. Connick, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994). This includes taking notice of pending judicial proceedings. Patterson v. Mobil Oil Corp., 335 F.3d 476, 481 n.1 (5th Cir. 2003). And, it includes taking notice of governmental websites. Kitty Hawk Aircargo, Inc. v. Chao, 418 F.3d 453, 457 (5th Cir. 2005); Coleman v. Dretke, 409 F.3d 665, 667 (5th Cir. 2005).

B.    Qualified Immunity

Qualified immunity insulates a government official from civil damages liability when the official's actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). For a right to be "clearly established," the right's contours must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Individual liability thus turns on the objective legal reasonableness of the defendant's actions assessed in light of clearly established law at the time. Hunter v. Bryant, 502 U.S. 224, 228 (1991); Anderson, 483 U.S. at 639-40. In Harlow, the

court explained that a key question is "whether that law was clearly established at the time an action occurred" because "[i]f the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." 457 U.S. at 818. In assessing whether the law was clearly established at the time, the court is to consider all relevant legal authority, whether cited by the parties or not. Elder v. Holloway, 510 U.S. 510, 512 (1994). If public officials of reasonable competence could differ on the lawfulness of defendant's actions, the defendant is entitled to qualified immunity. Mullenix v. Luna, 136 S. Ct. 305, 308 (2015); Malley v. Briggs, 475 U.S. 335, 341 (1986); Fraire v. City of Arlington, 957 F.2d 1268, 1273 (5th Cir. 1992). "[A]n allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." Malley, 475 U.S. at 341.

In analyzing whether an individual defendant is entitled to qualified immunity, the court considers whether plaintiff has alleged any violation of a clearly established right, and, if so, whether the individual defendant's conduct was objectively reasonable. Siegert v. Gilley, 500 U.S. 226, 231 (1991); Duckett v. City of Cedar Park, 950 F.2d 272, 276-80 (5th Cir. 1992). In

so doing, the court should not assume that plaintiff has stated a claim, i.e., asserted a violation of a constitutional right. Siegert, 500 U.S. at 232. Rather, the court must be certain that, if the facts alleged by plaintiff are true, a violation has clearly occurred. Connelly v. Comptroller, 876 F.2d 1209, 1212 (5th Cir. 1989). A mistake in judgment does not cause an officer to lose his qualified immunity defense. In Hunter, the Supreme Court explained:

> The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." Malley, [475 U.S.] at 343. . . . This accommodation for reasonable error exists because "officials should not err always on the side of caution" because they fear being sued. . . .

502 U.S. at 229.

When a defendant relies on qualified immunity, the burden is on the plaintiff to negate the defense. Kovacic v. Villarreal, 628 F.3d 209, 211 (5th Cir. 2010); Foster v. City of Lake Jackson, 28 F.3d 425, 428 (5th Cir. 1994).

IV.

## Analysis

A. Viability of Plaintiffs' Claims

Plaintiffs assert a claim for deliberate indifference to medical needs in their first count and appear to assert the same claim under the rubric of "due process" in their seventh count.

Where a particular amendment provides an explicit textual source of Constitutional protection, that amendment and not the more generalized notion of substantive due process must serve as the guide for analyzing the claim. Albright v. Oliver, 510 U.S. 266, 273 (1994). Therefore, the court is considering that one claim has been asserted based on the alleged deliberate indifference to Trevino's medical needs. Plaintiffs do not argue otherwise.

As for plaintiffs' state law claims for negligence and gross negligence, by having elected to sue City of Fort Worth, plaintiffs made an irrevocable election to pursue their state law tort claims against City only. Molina v. Alvarado, 463 S.W.3d 867, 871 (Tex. 2015); Tex. Civ. Prac. & Rem. Code § 101.106(a). Thus, the state law tort claims against movants must be dismissed with prejudice. Id. (Plaintiffs make no response in support of their state law negligence and gross negligence claims.)

To prevail on a claim of civil conspiracy requires plaintiffs to establish (1) an actual violation of a constitutional right, and (2) that the defendants acted in concert with the specific intent to violate the right. Cinel v. Connick, 15 F.3d 1338, 1343 (5th Cir. 1994). Further, to pursue a claim for conspiracy under § 1985(3), as plaintiffs purport to do, they must allege some racial or class-based discriminatory animus behind the conspiracy. Johnson ex rel. Wilson v. Dowd, 305

F. App'x 221, 224 (5th Cir. 2008); <u>Horaist v. Doctor's Hosp.</u>, 255

F.3d 261, 270 (5th Cir. 2001). A plaintiff must plead the

"operative facts" upon which a conspiracy claim is based. <u>Lynch</u>

<u>v. Cannatella</u>, 810 F.2d 1363, 1369-70 (5th Cir. 1987). Bald

assertions of a conspiracy are insufficient. <u>Id.</u> at 1370.

Plaintiffs have not alleged anything more than bald conclusions

with regard to their conspiracy claim. Accordingly, it must be

dismissed. (Again, plaintiffs make no response to the conspiracy

argument, apparently conceding its validity.)

B.   <u>Qualified Immunity</u>

Movants are presumed to enjoy qualified immunity; abrogation

of qualified immunity is the exception, not the rule. <u>Foster v.</u>

<u>City of Lake Jackson</u>, 28 F.3d 425, 428 (5th Cir. 1994). Thus, the

burden is on plaintiffs to show that movants' allegedly wrongful

conduct violated clearly established law. <u>Brumfield v. Hollins</u>,

551 F.3d 322, 326 (5th Cir. 2008). To be clearly established,

existing precedent must place the statutory or constitutional

question beyond debate. <u>White v. Pauly</u>, 137 S. Ct. 548, 551

(2017). That is, the clearly established law upon which

plaintiffs rely should not be defined at a high level of

generality, but must be particularized to the facts of the case.

<u>Id.</u> at 552. Thus, the failure to identify a case where an officer

acting under similar circumstances was held to have violated a

plaintiff's rights will most likely defeat plaintiff's ability to overcome a qualified immunity defense. Id.; Surratt v. McClarin, 851 F.3d 389, 392 (5ᵗʰ Cir. 2017).

In this case, plaintiffs point to three Eighth Circuit cases regarding methamphetamine intoxication as providing support for their position that movants are not entitled to qualified immunity.[4] In Grayson v. Ross, 454 F.3d 802 (8ᵗʰ Cir. 2006), the personal representative of the estate of a pretrial detainee who died following self-mutilation asserted claims against the officers who detained the decedent. The court determined that the officers were entitled to qualified immunity. The facts were that the decedent had been in a wreck. His car was found in a creek, with decedent standing next to it, soaking wet, and reporting that his vehicle was going to blow up. When an officer tried to arrest the decedent, he became combative. The officer struck the decedent on the head with his weapon and the decedent became cooperative. The decedent told the officer he was under the influence of some narcotic. The officer took the decedent to the jail where he changed into dry clothing, sat calmly, and

---

[4]Plaintiffs merely cite to these cases and do not discuss whether they constitute clearly established law of which every reasonable officer would have been aware. Doc. 41 at 6. Courts in the Fifth Circuit are to focus on the law of this Circuit, Thompson v. Upshur County, 245 F.3d 447, 458 (5ᵗʰ Cir. 2001), and are unlikely to find that stray opinions from other circuits constitute the "robust consensus of persuasive authority" needed to clearly establish the law. Morgan v. Swanson, 659 F.3d 359, 382 n.101 (5ᵗʰ Cir. 2011).

coherently answered questions. He appeared normal, was responsive and attentive, and did not display any signs that he was hallucinating. 454 F.3d at 806. The court determined that it would not have been obvious to a layperson that the decedent required immediate medical attention. Although the officer knew the decedent had taken methamphetamine, he did not know the amount taken or the time it was taken. Nor could he really determine the degree of intoxication because the decedent would not answer questions regarding his drug use and later refused to consent to a blood draw. His behavior did not indicate a high degree of intoxication.[5] Id. at 810.

In Barton v. Taber, 820 F.3d 958 (8th Cir. 2016), a pretrial detainee died of a heart condition in the holding room of a detention center following his arrest on intoxication-related charges. The court determined that officers were not entitled to qualified immunity where it was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." 820 F.3d at 964. The decedent became unconscious at the scene of a vehicle accident, could not stand or walk on his own, could not answer questions, and fell off a bench onto the floor at the detention center. Id.

---

[5]The opinion does not describe what a "high degree of intoxication" requiring medical attention would entail.

12

Finally, <u>McRaven v. Sanders</u>, 577 F.3d 974 (8th Cir. 2009), also concerned the death of a pretrial detainee. The decedent was arrested for driving while intoxicated from the influence of drugs. He appeared to be intoxicated and sleepy and at times fell asleep. A urine sample tested positive for marijuana, benzodiazepines, and opiates. The decedent told officers he had taken Seroquel, Hydrocodone, Depakote, and Ambien. He possessed a prescription issued the previous day for 90 tablets of Chlorzoxazone, a muscle-relaxer, but 21 pills were missing from the bottle. His coordination was described as poor, his speech slurred, his face flushed, and his eyelids droopy. His pulse, blood pressure, and temperature were down. 577 F.3d at 978. Officers discussed whether to take the decedent to the hospital, but decided not to based on the evaluation of a nurse practitioner who thought the decedent was sleeping off alcohol. <u>Id.</u> at 978-79. The court determined that the officers could not have reasonably relied on the medical opinion since the circumstances suggested that the decedent did not consume the drugs in prescribed doses; he exhibited symptoms of extreme intoxication; and, the medical opinion was based on the faulty assumption that the decedent had been drinking. <u>Id.</u> at 981.

The facts of this case fall somewhere between those of <u>Grayson</u>, on the one hand, and <u>Barton</u> and <u>McRaven</u>, on the other.

Trevino was initially calm and responsive. She was sitting quietly in a police car when she began vomiting. She denied having ingested anything and the vomiting did not appear to be serious. Then the seizures began and officers did not perceive them to be real. Thereafter, Trevino became unresponsive and an ambulance was called.

The investigative report attached as Exhibit A to plaintiffs' amended complaint reflects that: Narcotics officers McMeans, LaCroix and Garcia, among others received information from a confidential informant that Cortez and Trevino would have a large amount of methamphetamine in their car. Those officers were assisted by gang unit officers including Hinz, Hauck, Koplin, and McAnulty. Trevino's vehicle was stopped at 8:07 p.m. Doc. 32, Ex. A at 1. At approximately 9:34 p.m., Trevino vomited. Id. at 3, 43. At approximately 9:47 p.m., Trevino said she felt sick, was having seizures[6], and could not breathe. Id. at 4. At 10:30 p.m., an ambulance was called and did not arrive on the scene until 10:45 p.m. Id.[7]

---

[6]The court uses this term loosely and not as a medical term of art. There appears to be some question as to whether Trevino actually suffered seizures since she was able to continue talking as these events transpired. Doc. 32, Ex. A at 32-33, 41.

[7]The court notes that although the report states in a conclusory fashion that "[a]pproximately 56 minutes elapsed before officers called for medical assistance once Trevino started showing symptoms of medical distress," Doc. 32, Ex. A at 46, the facts set forth in the substantive part of the report reflect that none of the officers knew that Trevino needed medical help and failed to provide it in a timely manner.

(continued...)

The court considers the facts alleged as to each movant individually. And, to the extent that any allegation of the amended complaint is contradicted by the contents of the attached investigative report, the exhibit and not the allegation controls. United States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 377 (5th Cir. 2004).

As noted, although plaintiffs name Garcia and McMeans as defendants, they are not included in the term "Fort Worth Police Officers" against whom plaintiffs assert claims. Doc. 32 at 4, ¶ 15. Nor are they mentioned in plaintiffs' response to the assertion of immunity. Doc. 33. Officer McMeans is mentioned in paragraphs 25, 33, and 34 of the amended complaint; Officer Garcia is mentioned only in paragraph 36. No claims are stated against these movants. The claims against them will be dismissed.

Plaintiffs mention Officer Hinz in paragraphs 29, 30, and 31 of the amended complaint. Doc. 32. The investigative report reflects that Hinz was one of the officers who stopped Trevino's vehicle. Doc. 32, Ex. A at 1. At the direction of another officer, Hinz handcuffed Trevino and put her in the back of a patrol car. Hinz went to another patrol car where Cortez was

---

[7](...continued)
As a matter of common sense, vomiting does not always indicate medical distress in the sense that it requires immediate medical attention.

seated. He heard Koplin say that Trevino had vomited, so he walked back to the car where she was. Hinz saw a small amount of vomit and talked to Trevino and she was fine and acting normal. She said she was sick and needed air, so Hinz rolled down the windows and turned on the air conditioner all the way to high. He held open the car door for Trevino. She started dry heaving but never threw up again. Id. at 19. A couple of minutes after that, Trevino started shaking, throwing her hips up and side-to-side. Hinz asked what was going on and Trevino responded that she was sick and did not feel well. He asked if she wanted an ambulance and she did not answer. He determined that he would not call one if she did not want one. Trevino had three or four more episodes of shaking, each lasting a couple of minutes with a five minute rest in between. She repeatedly denied having ingested any drugs. Hinz first thought Trevino needed medical attention, but she just kept talking and "it didn't really seem real to me," so he did not call for an ambulance. He thought Trevino was trying to get out of going to jail. Id. at 20. Hinz has a family member who has seizures and Trevino's shaking episodes were not consistent with what he has observed. Trevino was answering questions during her episodes, whereas the family member cannot speak when having a seizure. Hinz thought Trevino's movements were voluntary. After the final episode, Trevino lay down on the car seat. Two to three

16

minutes later, officers were told to release Trevino. Hinz told
Trevino she was free to go and she did not respond. Hinz took off
her handcuffs while Koplin called for an ambulance. Id. at 21.
Hinz could see that Trevino was breathing. He saw a little spit
on her mouth but said it did not look like drug overdose-type
foam. He placed Trevino in the recovery position. Hinz left to
transport Cortez to jail. Id. at 22.

As Hinz notes in his reply, the facts alleged show that he
was not deliberately indifferent to Trevino's needs. Rather, he
went to check on her when he heard that she had been vomiting. He
rolled down the windows and turned on the air conditioning to
make her more comfortable. He did not believe she was suffering a
medical emergency, but feigning one to get out of going to jail.
At the point it was obvious to Hinz that Trevino needed medical
help, an ambulance had been called. Plaintiffs simply have not
alleged facts sufficient to overcome Hinz's claim of qualified
immunity.

Plaintiffs mention Officer Hauck in paragraphs 23 and 27 of
the amended complaint. Doc. 32. The investigative report reflects
that Hauck was one of the officers who stopped Trevino's vehicle.
Doc. 32, Ex. A at 1. Hauck recognized Trevino because he had
arrested her in 2013 and jailers found methamphetamine hidden in
Trevino's anus during a search at the jail. Hauck asked Trevino

17

if she was hiding any drugs this time and she said she was not. Id. at 2. Hauck said at first Trevino was acting fine, laughing and joking with officers, and he found nothing alarming about her behavior; however, her demeanor slowly started shifting as soon as another officer said to handcuff her and secure her in the patrol car. Id. at 22-23. Ten or fifteen minutes after Trevino had been handcuffed, Koplin told Hauck Trevino had vomited. Hauck walked to her and saw her rocking back and forth and talking, but also breathing and talking with officers. He believed her behavior was consistent with a person upset about going to jail. He did not see her convulsing or shaking. Hauck escorted Cortez to a patrol car. As they passed Trevino, Hauck saw her lie down. He escorted Cortez over to speak to Trevino. She did not respond when Cortez spoke to her. Hauck asked Cortez if he knew what was wrong—if Trevino had taken anything or had a medical problem-- and Cortez said "nah, nah, she's just tripping." Id. at 23. Hauck believed Cortez meant that Trevino was acting. Once it was determined that Trevino was not going to be arrested, officers called for an ambulance since they could not just leave her at the scene. When asked if he believed at any point during the incident that an ambulance should have been called, Hauck recounted that when Hinz told him Trevino was throwing up and shaking, he asked a narcotics supervisor what to do. The

18

supervisor asked if Hauck thought there was a medical emergency and Hauck said no. Id. at 24-25.

Based on the facts alleged, plaintiffs have not shown that Hauck was deliberately indifferent to Trevino's serious medical needs. He is entitled to qualified immunity.

Plaintiffs mention Officer McAnulty in paragraph 32 of the amended complaint. Doc. 32. The investigative report reflects that McAnulty did not interact much with Trevino because he was in charge of guarding the suspects' vehicle. Doc. 32, Ex. A at 13. He did walk back at one point to see if Hinz needed a break from guarding Trevino. Id. He saw Trevino handcuffed with her arms grabbing at her crotch area. He asked Hinz if Trevino had stuffed something. Hinz did not know but said Trevino denied doing so. McAnulty went back to guard the vehicle. Later, after Cortez went by the car, McAnulty said he could see that Trevino was still breathing and did not appear to have any difficulty breathing. LaCroix told officers to call for an ambulance and McAnulty stayed with Trevino. He told the medics that Trevino had been fine until they put her in handcuffs. McAnulty thought Trevino was not sick but had "jailitis" meaning that she was pretending to be sick to avoid jail. Id. at 14.

Plaintiffs have not overcome McAnulty's plea of qualified immunity. McAnulty was not with Trevino and the report does not

19

show that he had any reason to believe she needed medical attention before the ambulance was called.

Plaintiffs mention Officer Koplin in paragraphs 24, 27, 28, and 29 of their amended petition. Doc. 32. The investigative report reflects that Koplin provided security while Trevino was sitting on the curb. She talked and joked with him and other officers. She told him she was cold and asked to sit in the patrol car. Koplin asked her numerous times if she had any illegal drugs, weapons, or narcotics and she said she did not. He patted her down to make sure she had no weapons and allowed her to sit in the car. He watched her because he thought she would try to hide something. Doc. 32, Ex. A at 15. Trevino was interviewed, then handcuffed and placed back in the car. Koplin was sitting in the front seat when Trevino began yelling that the drugs were not hers. He did not pay any attention until he heard Trevino vomiting. Koplin opened the rear door and Trevino vomited more. When she got back into the car, Koplin saw that she was shaking and making herself cough. He asked Trevino what she was doing and she stopped and said she was having a seizure. Koplin thought it odd because, in his experience, people having seizures cannot talk. Id. at 16. He described her actions as shaking like she was cold. Koplin asked if she had had seizures before or if she had any medical issues and Trevino said she had not. Trevino

20

refused to say whether she had concealed or ingested narcotics or whether she needed an ambulance. Koplin did not believe Trevino was really sick. He thought she was faking illness to avoid going to jail. Id. at 17. At the point when Trevino was told she was free to go, she did not respond. Koplin made the decision to call an ambulance.[8] Koplin asked Trevino three to ten times whether she had ingested anything, because if she had "obviously . . . we do need to get them medical attention no matter what." Id. at 18.

Plaintiffs have not shown that Koplin is not entitled to qualified immunity. He, like the other officers, believed that Trevino was faking illness to avoid going to jail. At the point he realized that Trevino was not responsive, he called an ambulance. He never believed that Trevino had ingested narcotics.

Plaintiffs name Officer LaCroix in paragraphs 25 and 35 of their amended complaint. Doc. 32. The investigative report reflects that LaCroix assisted in interviewing Trevino. Once drugs were found in the purse in the suspects' vehicle, the officers decided to place Trevino under arrest. Up until that time, she had appeared calm and displayed no signs of medical distress. Doc. 32, Ex. A at 25. LaCroix put her in the back of a

---

[8]The report summary reflects that McAnulty called for the ambulance to come on a low priority call, Doc. 32, Ex. A at 4, but the substantive part of the report reflects that Koplin actually made the call. Id. at 18. McAnulty and Koplin waited for the ambulance to arrive. Id. at 4. Koplin and McAnulty told the paramedics that Trevino was faking illness. Id. at 34.

21

patrol car and Trevino kept yelling that the drugs were not hers. LaCroix took Cortez to another vehicle to be interviewed. LaCroix and Cortez could see Trevino sitting in the patrol car. Ten to twenty minutes into the interview, LaCroix saw Trevino cycling between calmness and agitation. He did not think her behavior out of the ordinary for someone going to jail. About 30-40 minutes into the interview another officer called LaCroix's cell phone. LaCroix got out of the car and a gang officer told him that Trevino said she was sick. The gang officer asked LaCroix if he wanted him to call an ambulance. The gang officer thought Trevino was pretending to be sick. Id. at 26. LaCroix said that if Trevino was faking, then she did not need an ambulance. His opinion was that he was not guarding Trevino, he was working with Cortez to arrange a narcotics transaction, and that those watching Trevino should make the decision about the ambulance. LaCroix returned to the interview. LaCroix said Cortez noticed Trevino kicking and said "man, she's tripping, she's crazy, she acts like this all the time when she gets angry." Id. at 27. Cortez was talking with an associate on a speaker phone, trying to arrange a drug deal at the behest of LaCroix, and told the associate that Trevino was acting crazy. The associate told Cortez he should get rid of Trevino, which affirmed LaCroix's opinion that Trevino was faking illness. A drug deal arranged by

Cortez was not tactically feasible, so LaCroix told Cortez he and Trevino would be charged with manufacturing and delivering a controlled substance. As Cortez walked by the car where Trevino was, he told her that he was taking responsibility for the drugs. Id. When officers opened the car door to let Trevino go, they shined a flashlight on her and LaCroix saw that her leg was doing an involuntary shake. He told officers to call an ambulance. The gang officers kept acting like Trevino was faking illness but LaCroix could tell she was really sick. In his opinion, the gang officers were naive.[9] Id. at 28.

Like the other movants, LaCroix is entitled to qualified immunity. The report reflects that he believed that Trevino was feigning illness and was acting out when she believed that she was going to jail. At the moment LaCroix saw that Trevino needed medical help, he directed officers to call an ambulance.

Of particular note is that Trevino did not exhibit symptoms that were obvious to the layperson that she had ingested methamphetamine.[10] The report includes an interview with a doctor board certified in emergency medicine and medical toxicology in Oregon. Doc. 32, Ex. A at 40-42. Among other things, he noted

---

[9] It goes without saying that naive is not the same thing as deliberately indifferent.

[10] That is, plaintiffs have not cited to any case to support such a proposition.

23

that "patients with severe outcomes showed up at the hospital
with symptoms such as a high temperature and an elevated heart
rate." Id. at 41. Here, there is no evidence that officers were
aware of these symptoms. More importantly, the doctor noted that
it was unlikely that Trevino was having seizures if she was
talking during the episodes. Id. He did say that methamphetamine,
especially if absorbed quickly, can cause movement disorders,
"kind of these writhing type of movements." Id. However,
plaintiffs have not cited to any clearly established law to show
that the average person would know of this. None of their Eighth
Circuit cases discuss symptoms like this.

Also of note is that the officers had found a large quantity
of methamphetamine in a woman's purse in the vehicle. Trevino was
the only woman in the vehicle. As the officers said, it would not
have made any sense for her to have swallowed bags of
methamphetamine to hide anything. Had Trevino admitted that she
swallowed anything or had she asked for help, officers would have
called an ambulance. She repeatedly denied having swallowed
anything and never asked for medical help. Again, plaintiffs have
not cited any authority to support the proposition that officers
were required to call an ambulance under these circumstances.

In sum, plaintiffs have not shown that any of the movants
was deliberately indifferent to Trevino's known serious medical

24

needs. Nor have they shown that any of movants violated clearly established law at the time.

V.

Order

The court ORDERS that movants' motions to dismiss be, and are hereby, granted, and that plaintiffs' claims against them be, and are hereby, dismissed with prejudice.

The court determines that there is no just reason for delay in, and hereby directs, entry of final judgment as to the dismissal of the claims against movants.

SIGNED August 25, 2017.

JOHN MCBRYDE
United States District Judge